17360

R. H. POPE, Respondent, v. MRS. HENRIETTA McMILLAN, qualified executrix of the estate of L. M. McMillan, deceased, MRS. HENRIETTA McMILLAN and LON McMILLAN, now or formerly co-partners trading and doing business under the name of McMillan Petroleum Company, Appellants

(101 S. E. (2d) 55)

*Messrs. Woods & Woods,* of Marion, *for Appellants,* 

*Messrs. Hinson & Hinson,* of Mullins, *for Respondent,*

December 4, 1957.

LEGGE, Justice.

Respondent sought in this action a declaratory judgment construing a written contract dated October 3, 1945, between L. M. McMillan, Mrs. Henrietta

McMillan, and Lon McMillan, copartners under the name of McMillan Petroleum Company, as parties of the first part, and respondent as party of the second part. L. M. McMillan having died in 1951, Mrs. Henrietta McMillan, as executrix of his estate, was joined as a defendant. The exact point in controversy is whether or not six underground tanks were included in the property sold to respondent and described in the third paragraph of the contract. The Judge of Probate for Marion County, to whom the cause had been referred, held that the six tanks in question were so included; and his report was confirmed in result by the Honorable G. Badger Baker, Judge of the Twelfth Judicial Circuit, by his decree of January 25, 1957, from which this appeal is taken.

The contract in question, so far as it is pertinent to the issue before us, reads as follows:

"This agreement, made and entered into on this the third day of October, A. D., 1945, by and between L. M. McMillan, Mrs. Henrietta McMillan, and Lon McMillan, co-partners, trading and doing business under the name of McMillan Petroleum Company, hereinafter called the first party, and R. H. Pope, hereinafter called the second party.

: "Witnesseth: That for and in consideration of the mutual covenants and agreements and the considerations hereinafter recited, passing from one to the other, the aforesaid parties covenant and agree, as follows:

"First. The said first party agrees to sell and has hereby sold to the second party all of the stock of merchandise now inventoried at Three Thousand Three Hundred Eighty-Eight and 90/100 ($3,388.90) Dollars, now on hand, for the amount of said inventory total. That the said second party shall pay for same as follows: Thirteen Hundred Eighty-Eight and 90/100 ($1,388.90) Dollars some time during the month of October, 1945; One Thousand ($1,000-.00) Dollars during the month of November, 1945; One Thousand ($1,000.00) Dollars during the month of December, 1945. The items of merchandise making up this inventory and included in this sale have been agreed to, and

it is understood of what they consist by both of the parties aforesaid. When the last of said payments shall have been made, and they may be made, if desired by the second party, before the due dates, the said merchandise becomes the property of the said second party, absolute.

"Second: The said first party agrees to rent, and by these presents has rented to the second party, the filling station, warerooms, office building, now used and occupied by the said first party in the town of Mullins, S. C., for an agreed rental of One Hundred and Fifty ($150.00) Dollars per month, payable monthly. The first of said payments to be made as of October first, 1945, and on the first of each succeeding month thereafter until all of the terms of this contract shall have been carried into execution, and the said second party agrees to use and occupy the said buildings for the purposes for which they are now being used, and to pay the rentals aforesaid promptly on or before the first of each month, beginning as of October first, 1945.

"Third: The said first party agrees to sell, and by these presents has sold to the said second party, the business and good will known as McMillan Petroleum Company, the tangible assets consisting of all equipment such as trucks, repair parts, tanks, pumps, franchises, wherever they may be dispursed (sic), located or situated, that are now owned and used by the said first party in the operation of its business, except, the tanks underground at the filling station, or thereabout, at the Mullins, S. C. plant, which are reserved to the first party, and are not included in this sale, but represent a part of the property rented to the second party as recited in the second paragraph of this contract. That the said second party agrees to pay for the said good will, franchises, and equipment the sum of Twenty Thousand ($20,000.00) Dollars, due and payable in amounts and in accordance with the schedule hereto attached and made a part of this contract, the first of such payments being due and payable on January first, 1946, in the amount of Three Hundred Sixteen Dollars and Sixty-Six ($316.66) Cents,

the last August first 1952 in the amount of Two Hundred and Fifty and 82/100 ($250.82) Dollars. Such payments representing payment of principal and interest as shown on the aforesaid schedule.

"Fourth: It is mutually agreed by and between the aforesaid parties, that the sales herein specified and enumerated, shall not be considered as fully consummated until the last payment herein required has been made by the second party to the first party, but when the said last payment shall have been made, then the sale shall be complete, consummated, and irrevocable. And should the said second party fail to make the payments herein required, in the manner and at the times provided, unless a change in such terms and conditions be agreed to by the parties hereto, the first party shall have the right to declare the terms of this contract broken, and require the second party to pay in full any amount or amounts shown due to the first party by the second party as shown by this contract, or the schedule hereto attached which is made a part thereof, and should 'the said second party not make such payment as then required, then in that event, they agree that the amounts theretofore paid to the first party by the second party shall be considered and treated as rentals for the use of the property, franchises, and good will herein transferred from the first party to the second party, and the said first party shall not be accountable to the second party for any such payments received, and shall be permitted to immediately go back into possession of all the assets herein conveyed."

Respondent was employed by McMillan Petroleum Company, in Mullins, South Carolina, from September, 1939, first as salesman, and thereafter as manager, until October, 1945, when the contract before mentioned was made. The company owned, in Mullins, a lot about one hundred feet square at the corner of Park and McIntyre Streets, where it operated a retail gasoline service station and a bulk plant from which was sold gasoline and motor oil in bulk to other service stations not owned by the company. On this lot were:

(1) a one-story brick building, of which the western part was used for offices and the eastern for the service station; and (2) the bulk plant warehouse or "warerooms", located to the north of the building before mentioned, and separated from it by a paved driveway running west from Park Street and used for unloading merchandise from trucks into the warehouse.

At the front of the service station were two 550-gallon underground gasoline tanks. At the front of the "office", just east of its doorway, was a 285-gallon underground tank, formerly used for low-grade gasoline, but more lately for kerosene. The six 4,000-gallon underground tanks in controversy were located behind the bulk plant warehouse and some thirty or forty feet north of the filling station. The bulk plant equipment consisted of the tanks last mentioned and two pumps with motors.

McMillan Petroleum Company owned both the filling station and the bulk plant, and operated each as a separate business. It also owned underground tanks at numerous service stations in Marion and Dillon Counties.

Turning now to the contract, we observe that it contains two distinct agreements of sale and one agreement of lease, as follows:

1. Sale of the stock of merchandise to be paid for in monthly instalments in October, November and December, 1945, title to remain in the seller until the final payment.

2. Lease of "the filling station, warerooms (and) office building", from October 1, 1945, to August 1, 1952 (the date of the last payment on the purchase price of the assets mentioned in the third paragraph), at a monthly rental of $150.00; and

3. Sale of "the business and good-will known as McMillan Petroleum Company", its franchises, and all of its "tangible assets consisting of all equipment such as trucks, repair parts, tanks (and) pumps" in both Marion and Dillon Counties, "except the tanks underground at the filling sta-

tion, or thereabout, at the Mullins, S. C., plant"; the price being $20,000.00, payable in instalments, the first on January 1, 1946 and the last on August 1, 1952.

In our opinion, the language of the agreement clearly indicates that the sale included all of the partnership's tangible assets except the lot and the office building, warerooms and filling station at the Mullins plant, which buildings the partnership would continue to own and rent to Mr. Pope, and except also the underground tanks that were an essential part of the filling station, viz.: the two 550-gallon tanks directly at the filling station and the 285-gallon tank nearby, in front of the office building. That such is the meaning of the contract is emphasized by the phrasing of the exception in its third paragraph: "except the tanks underground at the filling station, or thereabout, at the Mullins, S. C., plant, *which * * * represent a part of the property rented to the second party as recited in the second paragraph of this contract*". (Italics added.) As before noted, the only property described in the second paragraph of the contract as being rented to Mr. Pope consisted of the office-filling station building and the warerooms (warehouse). The six 4,000-gallon underground tanks were neither a part of the warehouse nor in any way incident to the use of that building. And we agree with the lower court that their location was so distant from and unconnected with the service station that it could not reasonably be said that they were "at the filling station or thereabout".

We find no merit in appellants' suggestion that the tanks in controversy must be deemed to have been excluded from the sale because they were "common-law fixtures", as distinguished from "trade fixtures", therefore part of the real estate, and therefore not included because no real estate was being sold. We know of no legal barrier to the voluntary sale of a common-law fixture, separate from the land upon which it is located, by the owner of both. The exclusion of the underground tanks at the filling station would seem to indicate that appellants thought

they could be sold without the land; otherwise there would have been no need for their exclusion.

Appellants suggest that the words "at the Mullins, S. C., plant," as used in the exclusionary phrase, should be construed as having reference to the bulk plant portion of the lot, on which the tanks in question are located. But it appears to us, as it did to the Circuit Judge, that the quoted words were used to designate the filling station at the Mullins plant as distinguished from the other filling stations in Marion and Dillon Counties in which McMillan Petroleum Company had interests and at which also were located underground tanks owned by that company. It seems to us, too, that had appellants intended to exclude the underground tanks behind the warerooms as well as those "at the filling station or thereabout", the contract would, in so many words, have excluded *all* of the tanks on the Mullins property instead of only those "at the filling station or thereabout."

Besides charging error in the Circuit Judge's construction of the contract in itself, appellants contend that respondent's testimony as to a verbal understanding between the parties, with regard to the property included in the sale, had been improperly admitted over objection, and so also with regard to certain ledger sheets and tax returns; and that the Circuit Judge may have been influenced in his consideration of the case by this irrelevant and incompetent evidence. But in his decree Judge Baker expressly ruled this oral testimony inadmissible, pointed out that the Probate Judge's report had not been based upon it, and concerning the ledger sheets and tax returns, said: "The admissibility of ledger sheets and tax returns does not have to be determined for, once again, there is no reference to these instruments in the report, and the decision herein is not dependent upon their contents."

Affirmed.

STUKES, C. J., and TAYLOR, OXNER and MOSS, JJ., concur.